UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
-----------------------------------------------------------x
DEBRA S. HAYES,                            :
                                           :
                         Plaintiff,        :        __ Civ. __
                                           :
     -against-                             :        **COMPLAINT**   12-293 Erie
                                           :
WADDELL & REED, INC. and                   :
LARRY M. KOZIK,                            :
                                           :        JURY DEMANDED
                         Defendants.       :
-----------------------------------------------------------x

Plaintiff Debra S. Hayes, by her attorney, William J. Kelly, Jr., Esquire, alleges as

follows:

## THE NATURE OF THE ACTION

1.      This is a civil action for damages and remedies for: (1) sex discrimination

in employment in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §

2000e *et seq.* ("Title VII"); (2) sex discrimination in employment in violation of the

Pennsylvania Human Relations Act; (3) sexual harassment in employment in violation of Title

VII (f); (4) sexual harassment in employment in violation of the Pennsylvania Human Relations

Act; (5) age discrimination in employment in violation of the Age Discrimination in

Employment Act, 29 U.S.C. §§ 621-634; (6) age discrimination in employment in violation of

the Pennsylvania Human Relations Act; (7) retaliation in violation of Title VII; (8) retaliation in

violation of the Pennsylvania Human Relations Act; (9) intentional infliction of emotional

distress; (10) negligent infliction of emotional distress; and (11) prima facie tort.

## THE PARTIES

2.      Ms. Hayes resides in Erie, Pennsylvania. Ms. Hayes was employed by Defendants Waddell & Reed, Inc. ("W&R") and Larry M. Kozik from April 2010 until her employment was terminated on October 28, 2011.

3.      Defendant, W&R, a corporation incorporated in Delaware, is doing business and located at 5473 Village Common Drive, Erie, Pennsylvania 16506 and has its principal place of business at 6300 Lamar Avenue, Overland Park, Kansas 66202.

4.      Defendant, Mr. Kozik, is employed by W&R as a Financial Advisor at W&R's Erie, Pennsylvania branch. At all times relevant to this Complaint, Mr. Kozik was Ms. Hayes' immediate supervisor and employer along with W&R.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1332 and 1367.

6.      Venue is proper in this district under § 1391(b) because a substantial part of the events giving rise to Ms. Hayes' claims occurred in the Western District of Pennsylvania.

7.      Ms. Hayes filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") on December 29, 2011, and received a Notice of Right to Sue on September 7, 2012.

## FACTS

8.      Ms. Hayes is a female, single mother of three children.

9.      Ms. Hayes was employed as a Marketing Assistant/Financial Advisor and then as an Administrative Assistant/Advisor Associate by W&R and Mr. Kozik in W&R's Erie, Pennsylvania office from April 2010 until her employment was terminated on October 28, 2011.

10.     Throughout her employment with W&R, Ms. Hayes was qualified for her positions and performed her duties in a professional and competent manner.

11.     Her immediate supervisor and employer, along with W&R, was Mr. Kozik, a Financial Advisor for W&R. During her tenure with W&R, Ms. Hayes was subjected to sexual harassment, sex discrimination, and age discrimination by Mr. Kozik and W&R. Although Ms. Hayes repeatedly complained to W&R management about Mr. Kozik's inappropriate behavior, W&R took no action to rectify this situation. Instead, on October 28, 2011, shortly after Ms. Hayes complained about another incident of sex discrimination and harassment, W&R and Kozik retaliated against her by terminating her employment.

**Mr. Kozik's Discriminatory and Sexually Harassing Treatment Against Ms. Hayes**

12.     While Ms. Hayes was employed at W&R, Mr. Kozik asked her to go out with him on romantic dates many times. She repeatedly told him that she was not interested in dating him and that she had a boyfriend. Additionally, Ms. Hayes expressed that she was uncomfortable with Mr. Kozik's behavior. Mr. Kozik continued to ask Ms. Hayes out and asked her to cheat on her boyfriend. Ms. Hayes informed Mr. Kozik that she would never do that.

13.     Mr. Kozik tried to convince Ms. Hayes to date him by promising that if she did, he would help advance her career at W&R by giving her his business.

14.     When Ms. Hayes still refused, Mr. Kozik often threatened her employment and told her that he could hire a younger employee for less compensation.

15.     Mr. Kozik sometimes got upset that Ms. Hayes refused his advances, and on various occasions threw papers or staplers at her and pounded his fists on Ms. Hayes' desk, and one occasion detailed below punched the door, her desk, and her chair. Additionally, Mr.

Kozik did not allow Ms. Hayes to take a lunch break, while everyone else on his staff was allowed to do so. Instead, he told Ms. Hayes that she could chew her food for five minutes.

16.     Mr. Kozik also engaged in inappropriate physical behavior towards Ms. Hayes. In approximately August 2011 and again in late September or early October 2011, Mr. Kozik exposed his genitals to Ms. Hayes. On both occasions, Mr. Kozik called Ms. Hayes on the phone and asked her to get something in his office. When Ms. Hayes knocked on his office door, he told her to come in, knowing that it was her because she has a distinct knock. On both occasions, when Ms. Hayes walked in, Mr. Kozik was at his desk, with is genitals exposed, masturbating.

17.     On both occasions, Ms. Hayes immediately left Mr. Kozik's office and complained to Melissa Grucza, Mr. Kozik's Office Manager, Shelley Tomcho, the Office Manager for W&R's Erie office, and then James Tracz, a W&R Managing Principal and the W&R manager in the Erie office. Ms. Tomcho said to Ms. Hayes that Mr. Kozik was "gross," and that she could not believe W&R let Mr. Kozik get away with such behavior, which she said was creating a hostile work environment. Mr. Tracz shook his head in disgust at what Mr. Kozik had done. Neither Ms. Grucza, Ms. Tomcho, nor Mr. Tracz, however, took any action.

18.     On many other occasions, Mr. Kozik called Ms. Hayes into his office and had pornography prominently displayed on his computer screen, or left pornography on his screen when he left the office such that Ms. Hayes saw it when she walked by his office or when she need to go into his office. Once, Mr. Kozik printed pornography and was reprimanded by Mr. Tracz when he found it on the printer.

19.     Furthermore, during holidays, Mr. Kozik gave Ms. Hayes unsolicited and unwelcomed hugs. When Ms. Hayes attempted to move away, Mr. Kozik squeezed her harder

and pressed his genitals against her and did not let go quickly. Ms. Hayes repeatedly complained to Ms. Grucza and Ms. Tomcho about this behavior.

20.　　Often, Mr. Kozik threw paper clips or staples on the floor and asked Ms. Hayes to bed over to pick them up so he could look down her shirt. When Ms. Hayes refused to do so, Mr. Kozik screamed at her and threatened her employment if she did not do what he had asked.

21.　　Mr. Kozik also harassed Ms. Hayes by interfering with her personal life. Mr. Kozik essentially stalked Ms. Hayes by driving by her home and her boyfriend's home after work. Ms. Hayes' neighbors and her mother often saw Mr. Kozik near Ms. Hayes' home, which was not near his home. On one of these occasions, Ms. Hayes was told by a client of Mr. Kozik's, who lives across the street from Ms. Hayes' boyfriend, that he had just seen Mr. Kozik driving on that street a few seconds before Ms. Hayes had arrived. Mr. Kozik does not live near Ms. Hayes' boyfriend either.

22.　　On October 9, 2010, Ms. Hayes' then-14-year-old daughter was raped. Mr. Kozik harassed Ms. Hayes by presenting numerous roadblocks for her during the criminal investigation. For example, Mr. Kozik refused to allow the police to enter the office to question Ms. Hayes and said that he would not allow the police in the office at all, after he heard that they had been there once.

23.　　Also, after the incident Ms. Hayes transferred her daughter to a new school because the individuals who had raped her attended her former school. On the first day of classes, the principal called Ms. Hayes at work. Ms. Hayes took the call because she was concerned that since the principal was calling her something bad had happened. While Ms. Hayes was on the phone with the principal, Mr. Kozik started pounding on the desk and

screaming that Ms. Hayes had to get off the phone, and made her hang up even after Ms. Hayes told him it was the principal at her daughter's new school. Mr. Kozik also refused to allow Ms. Hayes to attend the court proceedings in connection with this incident, and the police therefore had to subpoena her to appear in court.

24.     Mr. Kozik also harassed Ms. Hayes in many other ways that he did not do to male employees, such as by telling Ms. Hayes what shoes she was allowed to wear in the office, going through her garbage, telling her what she was allowed to buy with her personal money, and other things.

**Mr. Kozik Treated Other Females Employed at W&R Similarly,
and Made Discriminatory Comments About Women in General**

25.     Mr. Kozik also treated other female employees in a similar, harassing and discriminatory manner.

26.     For example, in November 2010, W&R and Mr. Kozik hired Lillian O'Brien as Mr. Kozik's assistant. Although Ms. O'Brien was an excellent employee, Mr. Kozik often commented to Ms. Hayes that Ms. O'Brien was a "stupid female with an accent" and told Ms. Hayes that "[he] couldn't stand her." He also made fun of Ms. O'Brien because she was a foreigner.

27.     Ms. O'Brien complained to Mr. Tracz and Ms. Tomcho about Mr. Kozik's treatment of her, but they told her that Mr. Kozik was a top producer, and did nothing to help her.

28.     Mr. Kozik terminated Ms. O'Brien's employment a week after her complaint.

29.     On a number of occasions, Mr. Kozik commented to Ms. Hayes that he "should just hire men."

30.    In September 2011, W&R and Mr. Kozik hired JoAnn Kincaid to perform temporary work for Mr. Kozik.  Mr. Kozik yelled at Ms. Hayes and Ms. Kincaid, falsely accusing them of interrupting him too much.  Mr. Kozik stated to them that "women are rude and ignorant" and that "males do not interrupt him."  He commented to them that "females are wired differently" and that he "hates them."

31.    Additionally, Mr. Kozik said that because women are slow, he would have to order for Ms. Hayes when he took the office staff to lunch because she took too long.

32.    Amy Hopson, who worked under Mr. Kozik, quit in 2010 after Mr. Kozik screamed at her and called her "stupid" while talking to her on speaker phone.  When Ms. Hopson applied for unemployment insurance benefits, Mr. Kozik told Ms. Hayes that she had to lie to the Pennsylvania Department of Labor by saying that Ms. Hopson had done things wrong in her job, such as not filing documents on a timely basis, and threatened to terminate Ms. Hayes' employment if she did not lie for him.  A hearing did not end up occurring, so Ms. Hayes never spoke to the Department of Labor.

**Male Employees at W&R Are Not Exposed to**
**the Same Discriminatory Treatment as Women**

33.    By contrast, upon information and belief, men at W&R are not subjected to the same treatment as women, and when on occasion an incident occurs in which a man is mistreated, W&R intervenes, unlike when a woman is mistreated.

34.    For example, on approximately October 10, 2011, Mr. Kozik yelled at Jack Lacey, a W&R Financial Advisor in the Erie office, regarding Mr. Lacey's attire.  Mr. Lacey reported the incident to Mr. Tracz.  Mr. Tracz reprimanded Mr. Kozik, and on October 11, 2011 Mr. Tracz issued a policy letter regarding bringing issues concerning office policies to Mr. Tracz.

35. In or around September 2011, Greg Brumagin and Matthew Malinowski, W&R Financial Advisors/Assistants in the Erie office, complained to Mr. Tracz about Mr. Kozik's behavior during a meeting. Again, Mr. Tracz reprimanded Mr. Kozik.

36. Neither Mr. Lacey, Mr. Brumagin nor Mr. Malinowski was let go.

**W&R Was Aware of Mr. Kozik's Sex Discrimination and**
**Sexually Harassing Behavior Towards Ms. Hayes, But Took No Action**

37. Although W&R was aware of Mr. Kozik's sex discrimination and sexually harassing treatment of Ms. Hayes and other women, the firm did nothing to rectify the situation. Ms. Hayes repeatedly reported incidents where Mr. Kozik harassed or discriminated against her to Mr. Tracz and Ms. Tomcho, as well as to Vincent Mastrey, the W&R District Manager in the Erie office. While Ms. Tomcho repeatedly expressed that she was appalled by Mr. Kozik's behavior, W&R took no action against Mr. Kozik.

38. For example, on one occasion Ms. Hayes told Mr. Tracz that Mr. Kozik was harassing her. Mr. Tracz replied that he and W&R have had issues with Mr. Kozik's behavior for years. In fact, Mr. Kozik was demoted from Division Manager to Financial Advisor three times (after having been promoted back to Division Manager) and was sent to anger management classes. Mr. Tracz further told Ms. Hayes that W&R's upper management was aware of the harassment, but was hesitant to do anything about it because "Kozik was one of their top producers."

39. In approximately mid-September 2011, Ms. Hayes informed Bruce Phillips ("Phillips"), a W&R Financial Advisor, that she was being sexually harassed by Mr. Kozik. He replied that everyone was aware of Mr. Kozik's harassing and discriminatory behavior towards Ms. Hayes and that he felt bad for her, but that W&R was not going to fix the situation because "Kozik is a top producer," which is why "he gets away with it."

8

**W&R Retaliated Against Ms. Hayes Because She Reported**
**Mr. Kozik's Sexually Harassing and Discriminatory Behavior**

40.     On approximately October 10, 2011, Mr. Kozik came into Ms. Hayes' office. Ms. Grucza was also present. Mr. Kozik was very angry because Ms. Hayes would not go out with him on a date. He began yelling at Ms. Hayes and asking her why he was still single despite the fact that he had a lot of money. Mr. Kozik punched Ms. Hayes' desk and her door, and then lunged towards her apparently to punch Ms. Hayes or her chair right next to her. Ms. Hayes moved out of the way, and he instead punched the back of her chair.

41.     Immediately afterwards, Ms. Hayes reported this incident to Ms. Tomcho. Ms. Hayes told Ms. Tomcho that she was scared that Mr. Kozik was going hurt her. Ms. Hayes also recounted again the many incidents of sexual harassment and discriminatory treatment of her by Mr. Kozik, including the times he exposed his genitals in front of her and followed her home or to her boyfriend's home. Ms. Hayes told Ms. Tomcho that she felt that Mr. Kozik's behavior was getting worse and that she needed Ms. Tomcho's help. Ms. Tomcho replied that "this is ridiculous, it's a hostile work environment," and called in Mr. Tracz.

42.     When Mr. Tracz arrived, he informed Ms. Hayes that she had only thirty seconds to tell him what had happened because he was in a hurry. Ms. Hayes described Mr. Kozik's violent behavior from earlier that day and told him that she was afraid. David Baldwin, the W&R National Sales Manager and a member of W&R upper management, was in the W&R Erie office that day, so Ms. Hayes asked Mr. Tracz and Ms. Tomcho whether they should tell him about the incidents with Mr. Kozik. Ms. Tomcho thought they should, but Mr. Tracz clearly wanted to avoid involving Mr. Baldwin, and said that Mr. Baldwin was leaving soon to catch a plane. Mr. Tracz then proceeded to usher Mr. Baldwin out of the office quickly in the middle of the meeting.

43.     Ms. Hayes asked Mr. Tracz whether upper management was aware of how inappropriate Mr. Kozik's behavior was.  Mr. Tracz replied, "the home office [located in Kansas] does know how bad it is but they choose to do nothing about it because Larry Kozik is a top producer." He further informed Ms. Hayes that he has "been trying to figure out what to do with Larry Kozik since he started at Waddell & Reed." Ms. Hayes told Mr. Tracz that she was scared about being left alone with Mr. Kozik, but that she was happy with her actual job, and could not afford to lose her job because she was supporting her three children.

44.     Ms. Grucza informed Ms. Hayes that Ms. Tomcho confirmed from Ms. Grucza her description of the incident in which Mr. Kozik ended up punching her chair.

45.     On October 12, 2011, Mr. Tracz came to Ms. Hayes' office to schedule an appointment for a Webex video conference between Mr. Kozik and Jim Turner, a W&R Regional Vice President and Mr. Tracz's superior who was based in the Kansas home office.  He said Mr. Kozik had to have three video meetings with Mr. Turner.  Mr. Tracz led Ms. Hayes to believe that the purpose of these meetings was to discuss Mr. Kozik's discriminatory, harassing behavior towards her.  The first meeting was scheduled for October 28, 2011.

46.     After Mr. Kozik's schedule was changed to indicate that his October 28, 2011 video conference with Mr. Turner was a so-called Sungard meeting about the suitability of customer's investments, Ms. Hayes asked Ms. Tomcho if she needed to be concerned that the meeting was not going to be about her complaints.  Ms. Tomcho indicated that she did not need to be concerned, whispering in Ms. Hayes' ear that the meeting was about "hostile work environment."

47.     On Friday, October 28, 2011, Mr. Turner and Mr. Kozik participated in the Webex video conference.

48.     Approximately three hours after this meeting, Mr. Kozik informed Ms. Hayes that her employment was being terminated for "lack of work."

49.     This explanation was clearly false. Ms. Hayes had been quite busy, Mr. Kozik had recently denied her permission to take vacation because she was so busy, and Mr. Kozik made his staff come in to work on Saturday, October 29, 2011 which was not typical. Also, Mr. Kozik hired a younger temp assistant named Jessica the day after terminating Ms. Hayes' employment.

50.     Rather, Mr. Kozik and W&R terminated Ms. Hayes' employment because of her sex and age and in retaliation for her complaints about his sexual harassment and sex discrimination.

51.     As a result of Mr. Kozik's and W&R's retaliatory and discriminatory treatment of Ms. Hayes, Ms. Hayes has suffered severe emotional distress, and has incurred damage and injury, including repeated chest pains requiring her to visit a physician.

**Ms. Hayes Was an Employee of W&R**

52.     Ms. Hayes was an employee of W&R because: (1) W&R had the right to control when, where and how Ms. Hayes performed her job; (2) W&R furnished the tools, materials and equipment used by Ms. Hayes; (3) Ms. Hayes' work was performed on W&R's premises; (4) W&R had the right to assign additional projects to Ms. Hayes; (5) Ms. Hayes was paid bi-weekly rather than the agreed cost of performing a particular job; (6) there was a continuing relationship between W&R and Ms. Hayes; (7) Ms. Hayes' work did not require a high level of skill or expertise; (8) W&R set the hours of work and the duration of the job; (9) Ms. Hayes did not hire and pay assistants; (10) W&R was in business; (11) the work performed by Ms. Hayes was part of the regular business of W&R; (12) Ms. Hayes was not engaged in her

11

own distinct occupation or business; (13) W&R could discharge Ms. Hayes; and (14) W&R and Ms. Hayes believed that they were creating an employer-employee relationship.

### i.    W&R Had the Right to Control When, Where and How Ms. Hayes Performed her Job

53.    W&R controlled the manner and means by which Ms. Hayes performed her job.

54.    For example, during her application process, W&R required Ms. Hayes to fill out a W&R specific job application.    During this process, Ms. Hayes was not only interviewed by Mr. Kozik, but she was also interviewed by Ms. Tomcho and Mr. Tracz, both employees of W&R.

55.    Also, upon her hiring, W&R gave Ms. Hayes an "Advisor Assistant (Unlicensed/Unregistered) Job Description" (the "Job Description"). The Job Description sets forth certain expectations, procedures and controls of W&R, including "Responsibilities & Permissible   Associated   Activities,"   "Prohibited   Activities   and   Transactions"   and "Requirements."

56.    Furthermore, W&R gave Ms. Hayes additional W&R-specific training materials in connection with her advisor and secretarial duties, and required her to complete various W&R training programs on W&R computers.    Ms. Tomcho received the same Job Description and training materials as Ms. Hayes, and was required to complete the same online training programs.

57.    W&R also required Ms. Hayes to attend office meetings and compliance meetings, and required her to follow all office policies and procedures.    In fact, on October 11, 2011, Mr. Tracz sent an email to all of the financial advisors in the Erie branch "relating to the Office Policies" and requested that "if [they had] an issue or see something that needs to be

addressed, please bring the issue to MY ATTENTION. . . This applies to both advisors *as well as assistants and office staff.*" (Emphasis added.)

58. According to W&R in a Sales Leadership Opportunities document, Mr. Tracz's "focus is to lead, motivate and mentor [his] management team, advisor force and administrative staff. [He] represent[s] Waddell & Reed in [his] community and the industry, as well as manages the day-to-day operation of the division office." Mr. Tracz's primary duties and responsibilities also included to "provide professional development and management of financial advisors, district managers and staff." As Ms. Hayes was part of Mr. Tracz's administrative staff, she was under Mr. Tracz's management and supervision.

**ii.     W&R Furnished the Tools, Materials and Equipment Used by Ms. Hayes**

59. W&R provided Ms. Hayes with all of the tools she used to accomplish her job duties.

60. For example, W&R provided Ms. Hayes with a W&R email account (dhayes@wradvisors.com), her own telephone extension number, a voicemail box, an office, a computer, a telephone, a facsimile machine, a copy machine, all desk supplies (including pens, pencils, staplers, paper and folders), and W&R letterhead.

**iii.     Ms. Hayes' Work was Performed on W&R's Premises**

61. W&R required Ms. Hayes to work from its Erie, Pennsylvania branch. In fact, her Job Description stated that Ms. Hayes was required to "work from an approved registered office location."

62. Ms. Hayes worked Mondays through Fridays from 9:00 a.m. until 4:00 p.m. at W&R's Erie branch.

63.     The main door to the W&R offices displayed the logo, "Waddell & Reed Inc."

64.     Upon entering W&R's Erie branch, a bulletin board directed visitors to the individual offices of W&R employees, including to Ms. Hayes' office.

### iv.     W&R Had the Right to Assign Additional Projects to Ms. Hayes

65.     W&R had the right to, and did, assign additional projects to Ms. Hayes.

66.     For example, W&R required Ms. Hayes to attend W&R-sponsored events, at which she was introduced as a W&R employee.

67.     Specifically, on one such occasion, W&R required Ms. Hayes to attend a company-sponsored commemorative World War II meet-and-greet with shareholders, during which Ms. Hayes, as well as other W&R employees, was required to wear a W&R polo shirt and was introduced as a W&R employee.

68.     One of Ms. Hayes' duties as a W&R employee was planning W&R's participation in various fairs. W&R required Ms. Hayes to secure booth space and insurance, and make payments to the fair sponsor. Ms. Hayes also worked with all of the W&R advisors, not just Mr. Kozik, to schedule their attendance at these fairs. Often times, Ms. Hayes was required to represent W&R at the company's booth to meet potential clients.

69.     Ms. Hayes not only reported to Mr. Kozik, but also to Mr. Tracz and Ms. Tomcho. Mr. Tracz and Ms. Tomcho gave Ms. Hayes work to do on a daily basis.

70.     For example, Ms. Tomcho often left the office and requested that Ms. Hayes take over her duties in her absence, which included interacting with clients, answering the phones, and handling the mail and Federal Express packages.

71.     Also, Mr. Tracz, on a daily basis, told Ms. Hayes to watch the office since she was only one present during the lunch hour.

72.     W&R also required Ms. Hayes to interact with clients who visited its Erie branch.

73.     For example, Ms. Hayes was required to greet clients and escort them to their financial advisor's (who was not always Mr. Kozik) office, or distribute documents brought in by clients to the proper financial advisor.

74.     Also, one of Ms. Hayes' duties was to notify W&R's West Virginia clients, via letters prepared on W&R letterhead, that they were being transferred to a new financial advisor.

75.     Throughout her employment at W&R, Ms. Hayes' name was included on W&R lists with names of employees who were required to attend W&R events, such as Christmas parties, lunches, and meetings.

v.     *Ms. Hayes Was Paid Bi-Weekly Rather than the Agreed Cost of Performing a Particular Job*

76.     Ms. Hayes received a bi-weekly salary rather than being paid an agreed cost for performing her job duties.

77.     W&R instructed its advisors and assistants to "follow W&R compensation guidelines."

78.     Although Ms. Hayes was paid a salary directly by Mr. Kozik, W&R reimbursed Mr. Kozik for a portion of Ms. Hayes' compensation through a program known as the Sungard Initiative.

79.     Furthermore, Ms. Hayes received some compensation directly from W&R.

### vi. There Was a Continuing Relationship Between W&R and Ms. Hayes

80.     W&R did not hire Ms. Hayes to complete a one-time project, but rather hired her as a full-time Marketing Assistant/Financial Advisor and then Administrative Assistant/Advisor Associate in W&R's Erie, Pennsylvania office.   Accordingly, it had a continuing relationship with Ms. Hayes until it terminated her employment on October 28, 2011.

### vii. Ms. Hayes' Work Did Not Require a High Level of Skill or Expertise

81.     Similarly, W&R did not hire Ms. Hayes to perform a specific task that required a specialized high level of skill or expertise.   W&R hired Ms. Hayes as a full-time Marketing Assistant/Financial Advisor and then Administrative Assistant/Advisor Associate.

### viii. W&R Set the Hours of Work and the Duration of the Job

82.     W&R required Ms. Hayes to work out of its Erie, Pennsylvania office Mondays through Fridays, from 9:00 a.m. until 4:00 p.m. This schedule was similar to that of the other W&R employees working out of that office.

### ix. Ms. Hayes Did Not Hire and Pay Assistants

83.     W&R did not give Ms. Hayes the ability to hire and pay her own assistants while she was employed at the company.

### x. W&R Was in Business

84.     W&R is a large corporation that was, and is, engaged in the business of asset management and financial planning.

### xi. The Work Performed by Ms. Hayes Was Part of the Regular Business of W&R

85.     The duties performed by Ms. Hayes included, among other things: (1) reviewing client transactions with W&R's home office; (2) assisting in organizing W&R sponsored events; (3) planning W&R's participation in various fairs; (4) interacting with clients

who visited the Erie branch; (5) answering the phones, and;  (6) handling the mail and Federal Express packages.

86.     W&R required Ms. Hayes to perform these tasks as part of its regular business of asset management and financial planning.

### xii.    *Ms. Hayes Was Not Engaged in Her Own Distinct Occupation or Business*

87.     At no point during her tenure at W&R was Ms. Hayes engaged in her own distinct occupation or business.

### xiii.   *W&R Could Discharge Ms. Hayes*

88.     Ms. Hayes was an at-will employee of W&R's, and therefore the company could discharge her (when doing so would not violate the law).

### xiv.    *W&R and Ms. Hayes Believed that They were*
### *Creating an Employer-Employee Relationship*

89.     Based on all of these factors, Ms. Hayes correctly believed that she had formed an employee-employer relationship with W&R.  It is clear through its treatment of Ms. Hayes, specifically the control it asserted over Ms. Hayes' performance, that W&R intended to create an employer-employee relationship.

## Mr. Kozik Was an Employee of W&R

90.     While Ms. Hayes was employed by Mr. Kozik and W&R, Mr. Kozik was an employee of W&R because, among other reasons:  (1) W&R had the right to control how Mr. Kozik executed his duties; (2) W&R furnished the tools and equipment Mr. Kozik used to do his job; (3) Mr. Kozik worked out of W&R's Erie office and did not pay rent to W&R for use of its office; (4) he was paid by W&R; (5) Mr. Kozik performed his work as part of W&R's regular business of asset management and financial planning; and (6) W&R had the right to terminate Mr. Kozik's employment.

91.     Specifically, W&R required Mr. Kozik to be present at its Erie branch every day, as well as attend certain company meetings and events.

92.     If he did not attend these mandatory meetings, he would be reprimanded by Mr. Tracz, Mr. Kozik's direct supervisor, the Managing Principal of the W&R Erie branch and a company employee.

93.     If Mr. Kozik scheduled meetings outside of the W&R office, he was expected to report such meetings to Mr. Tracz.

94.     Furthermore, Mr. Kozik received performance reviews from W&R and was expected to achieve certain sales goals.

95.     Mr. Kozik utilized W&R's equipment in fulfilling his job duties.

96.     Mr. Tracz had a significant amount of control over how Mr. Kozik performed his job.  As detailed in W&R's "Managing Principal Job Description," Mr. Tracz had the responsibility of supervising all "advisors in [the] division," which included conducting "annual career conferences," "quarterly performance reviews," and "regular one-on-one with experienced advisors and leadership team."

97.     Additionally, W&R represents to the public that Mr. Kozik is its employee.

98.     For example, on W&R's website, a client or prospective client is able to access Mr. Kozik's contact information as a W&R financial advisor, without ever being apprised of Mr. Kozik's supposed independence from the company.

99.     Similarly, W&R represents to the public that its "financial advisors utilize a personal inventory process to help [its clients] identify and prioritize their financial goals."

## FIRST CLAIM

### (Sex Discrimination In Violation of Title VII Against Defendants)

100.    Ms. Hayes repeats the facts contained in paragraphs 1 though 99 above as if separately set forth herein.

101.    At all relevant times, Ms. Hayes was an "employee" under Title VII, 42 U.S.C. § 2000e(f).

102.    Defendants are "employers" under Title VII, 42 U.S.C. § 2000e(b).

103.    By its actions detailed above, Defendants have unlawfully discriminated against Ms. Hayes on the basis of her sex in violation of Title VII.

104.    As a result of Defendants' discriminatory conduct, Plaintiff has suffered substantial damage.  Accordingly, Defendants are liable to Plaintiff for back pay, reinstatement or front pay in lieu of reinstatement in amounts as yet undetermined (including lost benefits), compensatory damages including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, attorneys' fees, interest and costs;

105.    Defendants' discriminatory conduct was taken with reckless indifference to Ms. Hayes' rights.  Ms. Hayes is therefore entitled to punitive damages to the maximum extent allowable by law under Title VII.

## SECOND CLAIM

### (Sex Discrimination In Violation of the Pennsylvania Human Relations Act Against Defendants)

106.    Ms. Hayes repeats the facts contained in paragraphs 1 though 105 above as if separately set forth herein.

107.    At all relevant times, Ms. Hayes was an employee within the meaning of the Pennsylvania Human Relations Act.

108.   At all relevant times, Defendants were "employers" as defined by the Pennsylvania Human Relations Act.

109.   By its actions detailed above, Defendants have unlawfully discriminated against Ms. Hayes on the basis of her sex.

110.   As a result of Defendants' discriminatory conduct, Plaintiff has suffered substantial damage.  Accordingly, Defendants are liable to Plaintiff for back pay, reinstatement or front pay in lieu of reinstatement in amounts as yet undetermined (including lost benefits), compensatory damages including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, attorneys' fees, interest and costs.

### THIRD CLAIM

**(Sexual Harassment In Violation of Title VII Against Defendants)**

111.   Ms. Hayes repeats the facts contained in paragraphs 1 though 110 above as if separately set forth herein.

112.   At all relevant times, Ms. Hayes was an "employee" under Title VII, 42 U.S.C. § 2000e(f).

113.   Defendants are "employers" under Title VII, 42 U.S.C. § 2000e(b).

114.   By its actions detailed above, Defendants have unlawfully sexually harassed Ms. Hayes in violation of Title VII.

115.   Defendants' sexual harassment of Ms. Hayes was severe and/or pervasive, and altered the conditions of her employement and created an abusive working environment.

116.   As a result of Defendants' discriminatory conduct, Plaintiff has suffered substantial damage.  Accordingly, Defendants are liable to Plaintiff for compensatory damages

including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, attorneys' fees, interest and costs.

117.    Defendants' discriminatory conduct was taken with reckless indifference to Ms. Hayes' rights.  Ms. Hayes is therefore entitled to punitive damages to the maximum extent allowable by law under Title VII.

## FOURTH CLAIM

### (Sexual Harassment In Violation of the Pennsylvania Human Relations Act Against Defendants)

118.    Ms. Hayes repeats the facts contained in paragraphs 1 though 117 above as if separately set forth herein.

119.    At all relevant times, Ms. Hayes was an employee within the meaning of the Pennsylvania Human Relations Act.

120.    At all relevant times, Defendants were "employers" as defined by the Pennsylvania Human Relations Act.

121.    By its actions detailed above, Defendants have unlawfully sexually harassed Ms. Hayes in violation of the Pennsylvania Human Relations Act.

122.    Defendants' sexual harassment of Ms. Hayes was severe and/or pervasive, and altered the conditions of her employement and created an abusive working environment.

123.    As a result of Defendants' discriminatory conduct, Plaintiff has suffered substantial damage.  Accordingly, Defendants are liable to Plaintiff for compensatory damages including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, attorneys' fees, interest and costs.

## FIFTH CLAIM

**(Age Discrimination In Violation of the Age Discrimination
in Employment Act Against Defendants)**

124.   Ms. Hayes repeats the facts contained in paragraphs 1 though 123 above
as if separately set forth herein.

125.   At all relevant times, Ms. Hayes was an "employee" of Defendants under
29 U.S.C. § 630(f) of the ADEA.

126.   At all relevant times, Defendants were "employers" of Ms. Hayes under
29 U.S.C. § 630(b).

127.   By its actions detailed above, Defendants have unlawfully discriminated
against Ms. Hayes on the basis of her age.

128.   As a result of Defendants' discriminatory conduct, Plaintiff has suffered
substantial damage.  Accordingly, Defendant is liable to Plaintiff for both back pay and front pay
in lieu of reinstatement in amounts as yet undetermined, compensatory damages including those
resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at
trial, attorneys' fees, interest and costs.

129.   Defendants' conduct in discriminating against Plaintiff on the basis of her
age was willful, entitling Ms. Hayes to an additional sum of liquidated damages of doubling of
the back pay pursuant to 29 U.S.C. § 626(b).

## SIXTH CLAIM

**(Age Discrimination In Violation of the Pennsylvania
Human Relations Act Against Defendants)**

130.   Ms. Hayes repeats the facts contained in paragraphs 1 though 129 above
as if separately set forth herein.

131.   At all relevant times, Ms. Hayes was an employee within the meaning of the Pennsylvania Human Relations Act.

132.   At all relevant times, Defendants were "employers" as defined by the Pennsylvania Human Relations Act.

133.   By its actions detailed above, Defendants have unlawfully discriminated against Ms. Hayes on the basis of her age.

134.   As a result of Defendants' discriminatory conduct, Plaintiff has suffered substantial damage.  Accordingly, Defendants are liable to Plaintiff for back pay, reinstatement or front pay in lieu of reinstatement in amounts as yet undetermined (including lost benefits), compensatory damages including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, attorneys' fees, interest and costs.

## SEVENTH CLAIM

### (Retaliation In Violation of Title VII Against Defendants)

135.   Ms. Hayes repeats the facts contained in paragraphs 1 though 134 above as if separately set forth herein.

136.   At all relevant times, Ms. Hayes was an "employee" under Title VII, 42 U.S.C. § 2000e(f).

137.   Defendants are "employers" under Title VII, 42 U.S.C. § 2000e(b).

138.   Ms. Hayes opposed Defendants' unlawful, discriminatory employment practices and engaged in protected activity under Title VII.

139.   Defendants retaliated against Ms. Hayes for having engaged in the protected activity described in the preceding paragraph by harassing her and terminating her employment.

140.   Defendants' actions constitute retaliation against Plaintiff in violation of Title VII.

141.   As a result of Defendants' discriminatory conduct, Plaintiff has suffered substantial damage.  Accordingly, Defendants are liable to Plaintiff for back pay, reinstatement or front pay in lieu of reinstatement in amounts as yet undetermined (including lost benefits), compensatory damages including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, attorneys' fees, interest and costs;

142.   Defendants' discriminatory conduct was taken with reckless indifference to Ms. Hayes' rights.  Ms. Hayes is therefore entitled to punitive damages to the maximum extent allowable by law under Title VII.

## EIGHTH CLAIM

### (Retaliation In Violation of the Pennsylvania Human Relations Act Against Defendants)

143.   Ms. Hayes repeats the facts contained in paragraphs 1 though 142 above as if separately set forth herein.

144.   At all relevant times, Ms. Hayes was an employee within the meaning of the Pennsylvania Human Relations Act.

145.   At all relevant times, Defendants were "employers" as defined by the Pennsylvania Human Relations Act.

146.   Ms. Hayes opposed Defendants' unlawful, discriminatory employment practices and engaged in protected activity under the Pennsylvania Human Relations Act.

147.   Defendants retaliated against Ms. Hayes for having engaged in the protected activity described in the preceding paragraph by harassing her and terminating her employment.

148.   Defendants' actions constitute retaliation against Plaintiff in violation of the Pennsylvania Human Relations Act.

149.   As a result of Defendants' discriminatory conduct, Plaintiff has suffered substantial damage. Accordingly, Defendants are liable to Plaintiff for back pay, reinstatement or front pay in lieu of reinstatement in amounts as yet undetermined (including lost benefits), compensatory damages including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, attorneys' fees, interest and costs.

## NINTH CLAIM

### (Intentional Infliction of Emotional Distress Against Defendants)

150.   Ms. Hayes repeats the facts contained in paragraphs 1 though 149 above as if separately set forth herein.

151.   Defendants' conduct, as set forth in this Complaint, was so outrageous in character and so extreme in degree as to fall outside the bounds of decency.

152.   Defendants' conduct was done with the intent that Plaintiff would suffer severe emotional distress and/or with reckless disregard for same.

153.   At all times relevant hereto, Defendants knew or should have known with substantial certainty that severe emotional distress would be the result of their conduct.

154.   As a direct result of such unlawful, intentional, and/or reckless actions by Defendants, Plaintiff has suffered severe emotional distress, which is, or may be, permanent in nature, and has incurred damage and injury.

155.   As a further direct result of such unlawful, intentional, and/or reckless actions by the Defendants, Plaintiff has been caused to undergo and experience in the past, and

will or may continue to undergo and experience in the future, significant suffering, humiliation, and embarrassment.

156.    As a further direct result of such unlawful, intentional and/or reckless actions by the Defendants, Plaintiff has and will require medical treatment.

157.    As a result of Defendants' unlawful, intentional and/or reckless actions, Plaintiff has suffered substantial damage.  Accordingly, Defendants are liable to Plaintiff for compensatory damages, including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial and punitive damages.

## TENTH CLAIM

### (Negligent Infliction of Emotional Distress Against Defendants)

158.    Ms. Hayes repeats the facts contained in paragraphs 1 though 157 above as if separately set forth herein.

159.    Defendants have a duty to act in the same manner as would a reasonably prudent person.

160.    A reasonably prudent person exercising due care would have refrained from the unlawful, reckless, and negligent conduct described in this Complaint because of the unreasonable risk that such actions could have caused Plaintiff to suffer emotional distress.

161.    Defendants breached their duty by acting in the manner described herein and by failing to act in the manner of a reasonably prudent person.

162.    As a direct result of such negligent actions by Defendants, Plaintiff has suffered severe emotional distress which is, or may be, permanent in nature, and has incurred damage and injury.

163.    As a further result of such negligent actions by Defendants, Plaintiff has been caused to undergo and experience in the past, and will or may continue to undergo and experience in the future, significant suffering, humiliation, and embarrassment.

164.    As a further direct result of such negligent actions by Defendants, Plaintiff has and will require medical treatment.

165.    As a result of Defendants' negligent actions, Plaintiff has suffered substantial damage. Accordingly, Defendants are liable to Plaintiff for compensatory damages, including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, and punitive damages.

## ELEVENTH CLAIM

### (Prima Facie Tort Against Defendants)

166.    Ms. Hayes repeats the facts contained in paragraphs 1 though 165 above as if separately set forth herein.

167.    Defendants' conduct, as set forth in this Complaint, has intentionally caused Plaintiff injury. Defendants' conduct is culpable and has no lawful justification.

168.    As a result of Defendants' negligent actions, Plaintiff has suffered substantial damage. Accordingly, Defendants are liable to Plaintiff for compensatory damages, including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, and punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      On her First Claim for violation of Title VII, back pay, reinstatement or front pay in lieu of reinstatement in amounts as yet undetermined (including lost benefits), compensatory damages including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, punitive damages to the maximum extent allowable by law, attorneys' fees, interest and costs;

B.      On her Second Claim for violation of the Pennsylvania Human Relations Act, back pay, reinstatement or front pay in lieu of reinstatement in amounts as yet undetermined (including lost benefits), compensatory damages including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, attorneys' fees, interest and costs;

C.      On her Third Claim for violation of Title VII, compensatory damages including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, punitive damages to the maximum extent allowable by law, attorneys' fees, interest and costs;

D.      On her Fourth Claim for violation of the Pennsylvania Human Relations Act, compensatory damages including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, attorneys' fees, interest and costs;

E.      On her Fifth Claim for violation of the Age Discrimination in Employment Act, Defendants are liable to Plaintiff for both back pay and front pay in lieu of reinstatement in amounts as yet undetermined, compensatory damages including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, liquidated damages of doubling of the back pay, attorneys' fees, interest and costs.

F.     On her Sixth Claim for violation of the Pennsylvania Human Relations Act, back pay, reinstatement or front pay in lieu of reinstatement in amounts as yet undetermined (including lost benefits), compensatory damages including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, attorneys' fees, interest and costs;

G.     On her Seventh Claim for violation of Title VII, back pay, reinstatement or front pay in lieu of reinstatement in amounts as yet undetermined (including lost benefits), compensatory damages including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, punitive damages to the maximum extent allowable by law, attorneys' fees, interest and costs;

H.     On her Eighth Claim for violation of the Pennsylvania Human Relations Act, back pay, reinstatement or front pay in lieu of reinstatement in amounts as yet undetermined (including lost benefits), compensatory damages including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, punitive damages, attorneys' fees, interest and costs;

I.     On her Ninth Claim for intentional infliction of emotional distress against Defendants, compensatory damages including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial and punitive damages;

J.     On her Tenth Claim for negligent infliction of emotional distress against Defendants, compensatory damages including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, and punitive damages;

K.    On her Eleventh Claim for prima facie tort against Defendants, compensatory damages including those resulting from Plaintiff's emotional distress and mental anguish in an amount to be determined at trial, and punitive damages; and

L.    Such other and further relief as the Court deems just and proper.

Dated:  Erie, Pennsylvania
        November 20, 2012

By:_____
        William J. Kelly, Jr.

*Attorney for Plaintiff*
100 State Street, Suite 440
Erie, Pennsylvania 16507
Tel: (814) 456-1919
Fax: (814) 456-3040
bill@kellyfirm.com
Pa. I.D. No. 67890